**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ANDREW SUH, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| v. | ) No. 03 C 7014 |
| | ) |
| STEPHEN D. MOTE, Warden, | ) Judge Rebecca R. Pallmeyer |
| | ) |
| Respondent. | ) |

## MEMORANDUM OPINION AND ORDER

Petitioner Andrew Suh was convicted of first-degree murder and armed robbery following a bench trial in the Circuit Court of Cook County before Judge John E. Morrissey. In a state court petition for postconviction relief, Suh argued that his conviction was tainted by Judge Morrissey's relationship with relatives of the crime's victim. The state court denied Suh's petition, finding that, although Judge Morrissey was acquainted with an uncle and a cousin of the victim, their relationships were not close ones, and Judge Morrissey did not even know that the victim was related to his acquaintances. Suh petitions this court for a writ of habeas corpus, repeating his judicial bias argument and also raising an argument under the Fourth Amendment. For the reasons that follow, Suh's petition is denied.

## FACTUAL BACKGROUND[1]

### A. The Murder of Robert O'Dubaine

On September 25, 1993, Robert O'Dubaine was shot twice and killed as he entered the garage of his home in Chicago's Bucktown neighborhood. (Resp's Ex. F, at 2.) The next day, police interviewed O'Dubaine's common-law wife, Catherine Suh. (*Id.* at 8-9.) Further investigation by the police suggested that Catherine had not been truthful in the interview, so she was

---

[1] Except where the facts are in dispute, the factual background is drawn from the decisions of the Illinois courts, whose factual findings the court presumes to be correct. 28 U.S.C. § 2254(e)(1).

interviewed again on November 5. (*Id.* at 9-11.) In her second interview, Catherine Suh admitted that, shortly before the murder, she had called O'Dubaine from a bar to say that she was having car trouble in order to lure him into the garage. (*Id.* at 10-11.) Catherine Suh was arrested and later charged with and convicted of first degree murder and armed robbery.

**B.      Suh's Apprehension and Confession**

Five days after Catherine Suh was arrested, her brother, Andrew Suh, aroused the suspicion of Drug Enforcement Administration agents at the Dallas-Fort Worth Airport. (Resp's Ex. F, at 3-4.) Andrew Suh, then a 19-year-old scholarship student at Providence College in Rhode Island, was changing planes as he traveled from Los Angeles to Indianapolis. (*Id.* at 3-4, 20.) Though the agents informed Suh that he was not under arrest and free to go, he agreed to answer their questions. (*Id.* at 3-4.) Suh told the agents that he was on his way to Indianapolis to post bond for Catherine, whom he suspected of trying to set him up for the murder of O'Dubaine. (*Id.* at 5.) Suh told the DEA agents that he was not carrying any illegal drugs, and he agreed to a search of his carry-on bag. (*Id.*) The agents found about $1,700 in the bag and Suh voluntarily handed over another $55,000 he had been keeping on his person. (*Id.* at 5-6.) The agents told Suh that they were going to take the money for a canine sniff for narcotics and gave him the choice of taking his flight to Indianapolis or accompanying them to the on-site DEA office. (*Id.*) Suh chose to remain with the money and waited in a public lounge while the cash was tested. (*Id.* at 6.) The agents told Suh that the dog gave a positive response and that they were going to seize the money. (*Id.*) Then the agents helped Suh change his reservation so that his final destination was not Indianapolis but Chicago, where, he explained, Catherine was being held. (*Id.* at 6-7.) Suh was allowed to fly to Chicago on his own, but the DEA agents told the Chicago police department to expect him. (*Id.* at 7.)

When Suh arrived in Chicago, two officers approached him and identified themselves. (*Id.* at 7.) After the officers told Suh that detectives from the Area 5 police headquarters wanted to talk

to him about O'Dubaine's killing, Suh began crying, hugged one of the officers, and told them that he wanted to "tell the truth." (*Id.*) Suh agreed to accompany the officers to Area 5 police headquarters for questioning. He was neither placed under arrest nor restrained during the trip. (*Id.* at 7-8.) At the station, Suh was advised of his constitutional rights, and eventually confessed to murdering O'Dubaine. (*Id.* at 8.) Suh explained that his sister had repeatedly complained to him that O'Dubaine was physically abusing her and spending her money, and had repeatedly sought help in a plan to murder O'Dubaine. (*Id.* at 13.) Suh had agreed to help his sister and hid in the garage of the home shared by O'Dubaine and Catherine Suh. (*Id.* at 14.) After Catherine called O'Dubaine to say that she needed help with her car, O'Dubaine went to the garage to get his own car and Andrew Suh, who had been waiting there for hours, shot him twice in the head. (*Id.* at 14-15.) Then Suh took O'Dubaine's car keys and drove away in his Jeep. (*Id.*)

**C.    Conviction, Direct Appeal, and First Two Postconviction Petitions**

Before trial, Suh sought to suppress his confession and the evidence found on his person, which included O'Dubaine's wallet. (Resp's Ex. F, at 8, 16.) His motion was denied, and Suh was tried for the murder of O'Dubaine and for armed robbery, vehicular hijacking, and burglary for taking O'Dubaine's car. (*Id.* at 8, 18.) Suh had a bench trial before Judge Morrissey, who found him guilty of first degree murder, armed robbery, and vehicular hijacking. (*Id.* at 18.) Morrissey found Suh eligible for the death penalty, but ultimately sentenced him to 80 years for murder and 20 years for armed robbery, to run consecutively (the vehicular hijacking and armed robbery counts merged). (*Id.* at 23.) Catherine Suh, also convicted of first degree murder and armed robbery, received a sentence of life in prison. (*Id.* at 26.)

In his direct appeal, Andrew Suh argued (1) that the trial court erred in denying his pretrial motion to suppress; (2) that his sentence was excessive and an abuse of discretion; and (3) that the sentences for murder and armed robbery should not run consecutively. The appellate court reasoned that a person in Suh's position at the Dallas airport would have felt free to leave, that the

3

DEA agents' search of his bag was founded on reasonable suspicion, that he was not detained for an unreasonable length of time while his cash was sniffed for drugs, and that his interactions with authorities up to his arrest were consensual. Accordingly, the appellate court concluded that Suh's Fourth Amendment rights had not been violated and affirmed his conviction. (*Id.* at 30-42.). The court also rejected Suh's challenge to the duration of his sentence, reasoning that the trial court had properly balanced the mitigating and aggravating factors. (*Id.* at 46-50.) The appellate court did, however, find that the trial court erroneously ordered consecutive sentences, and ordered the sentences to run concurrently instead. (*Id.* at 50-52.) The Illinois Supreme Court denied Suh leave to appeal. *People v. Suh*, 188 Ill.2d 579, 729 N.E.2d 503 (2000).

While Suh's direct appeal was pending, he filed his first postconviction petition in the Circuit Court of Cook County, arguing ineffective assistance of counsel at trial and on appeal. (Resp's Ex. I.) The trial court denied the petition. (Resp's Ex. J.) After the Illinois Supreme Court denied Suh leave to appeal from his direct appeal, he filed his second postconviction petition, arguing that his sentence violated *Apprendi v. New Jersey*, 530 U.S. 466 (2000). (Resp's Ex. K.) The court denied that petition as well. (Resp's Ex. L.) The appellate court reviewed the denials of both petitions in a single order and affirmed. (Resp's Ex. P.) The Illinois Supreme Court denied Suh's petition for leave to appeal. *People v. Suh*, 201 Ill.2d 607, 786 N.E.2d 197 (2002).

## D. Suh's Third Postconviction Petition

While Suh's appeal from the denial of his first two petitions was pending, Patrick Lavery, a playwright researching Suh's story, interviewed Sister Barbara McCarry, who had been the principal of Suh's grade school and was very knowledgeable about the case. (Petr's Ex. J ¶ 2-3, Ex. X, at 22.) According to Lavery, McCarry reported that the judge at Suh's trial was close to the victim's family, but she was afraid to discuss the matter in more detail. (Petr's Ex. J. ¶ 4.) Lavery stated that he called McCarry later in the hopes that she would be more forthcoming, but she refused and ended the call abruptly. (*Id.* ¶ 5.)

4

Suh filed a third postconviction petition on October 2, 2003.[2] In that petition, Suh, citing Lavery's affidavit, argued that Judge Morrissey had ties to the family of the victim that created a constitutionally impermissible potential for judicial bias. (Resp's Ex. S.) The trial court denied Suh's request to use coercive discovery tools to investigate his allegations, (Resp's Ex. V), so his lawyers relied on evidence gathered through a private investigator and through voluntary telephone interviews with Judge Morrissey and members of the victim's family. (Petr's Ex. N, Ex. O.) That evidence showed the following connections between Judge Morrissey and the victim, Robert O'Dubaine: Judge Morrissey served on the Cook County First Municipal District Court with Judge John Divane, who is O'Dubaine's uncle. (Resp's Ex. AA, at 3.) In addition, Judge Morrissey attended high school with William Divane, who is the cousin of O'Dubaine's mother. (*Id.*)

In a telephone interview, Judge Morrissey told Suh's lawyers that he and William Divane were "casual friends, who used to pal around together," but that he had not known that William Divane was related to O'Dubaine. (Pet's Ex. O, at 8.) Suh's lawyers also interviewed a friend of William Divane's, Walter Morrissey (apparently no relation to Judge Morrissey), who attended high school with Divane and Judge Morrissey. According to one of the lawyer's notes, Walter Morrissey reported that William Divane and Judge Morrissey saw each other regularly and are "great, long-time friends." (*Id.* at 10.) The day after the interview, however, Walter Morrissey called Suh's lawyers back, this time in the role of William Divane's legal representative. In this second conversation, Walter Morrissey stated that William Divane had told him that in fact there was no relationship between himself and Judge Morrissey. (*Id.* at 13.) When one of Suh's lawyers expressed the view that Walter Morrissey's statements were not consistent with what he had said the day before, Morrissey disagreed. (*Id.* at 13.) As the court reads the record, it appears that in

---

[2] Suh filed his federal habeas petition on the same day in order to comply with AEDPA's one-year statute of limitation. 28 U.S.C. § 2244(d). This court stayed the federal petition pending resolution of the state petition. (Order of Oct. 30, 2003.)

the second conversation, Walter Morrissey denied ever saying that Judge Morrissey and William Divane were "great, long-time friends."[3] In a subsequent letter to the lawyer, Walter Morrissey wrote, "I state for the record that in our brief conversation today, your reference to one of my discussion points of the earlier conversation was not accurate." (*Id.* at 26.)

In his interview, Judge Morrissey also told the lawyers that Judge Divane had never contacted him about the case. (*Id.* at 8.) Judge Divane was interviewed as well and agreed that he never spoke to Judge Morrissey about the case. (*Id.* at 20.) Judge Divane said that he did not even know Judge Morrissey. (*Id.* at 19.) Finally, Judge Divane told Suh's lawyer that he had met with McCarry after she met with Lavery because McCarry believed that Lavery was making accusations that Judge Divane had improperly influenced the trial. (*Id.* at 20-21.) McCarry was interviewed as well. She told Suh's lawyers that she believed that it was Lavery who brought up the connection between O'Dubaine and Judge Morrissey. (*Id.* at 7.)

The court denied Suh's third petition, (Resp's Ex. W), and the Illinois Appellate Court affirmed both the trial court's refusal to order discovery and its denial of the petition. (Resp's Ex. AA.) First, the appellate court reasoned that the trial court's ruling on discovery was not an abuse of discretion because further inquiry would have been "nothing more than a fishing expedition." (*Id.* at 10-12.) Next, the court affirmed the denial of Suh's third petition because the evidence showed that Judge Morrissey's connection to the victim's family was too insubstantial to create a significant probability of bias. (*Id.* at 12-13.) The Illinois Supreme Court denied Suh's petition for leave to appeal. *People v. Suh*, 225 Ill.2d 670, 875 N.E.2d 1122 (2007).

### E. Federal Habeas Petition

After the Illinois Supreme Court denied Suh's petition for leave to appeal, this court lifted its

---

[3] In fact, the lawyer's notes reporting that statement read as follows: "Walter stated that he and Bill were great, long-time friends." (Petr's Ex. O, at 10.) It is unclear whether the "he" refers to Judge Morrissey or to Walter Morrissey.

stay. (Order of Nov. 7, 2007.) The court then granted Suh's motion for discovery and allowed him to take depositions of Judge Morrissey, Judge Divane, William Divane, and McCarry. (Order of Dec. 6, 2007.)

In her deposition, McCarry admitted meeting with Lavery and discussing her knowledge of Andrew Suh, but testified that she has no recollection of ever mentioning a connection between Judge Morrissey and the victim's family. (Petr's Ex. X, at 22, 88.) Moreover, she denied that she could have commented on such a connection, noting that she did not even know who the trial judge had been before her interview with Lavery. (*Id.* at 22-23.) Based on the interview, McCarry believed that Lavery was trying to discredit Judge Morrissey and Judge Divane. (*Id.* at 97-98.) Acting on that belief, McCarry called Judge Divane—they were acquainted because McCarry had been the principal of the elementary school attended by Judge Divane's children—and asked him to meet her in person. (*Id.* at 31, 33, 97-109.) Judge Divane testified that he agreed to the meeting and drove to see McCarry. (Petr's Ex. U, at 104-05.) At the meeting, McCarry told Judge Divane that she believed that Lavery intended to accuse Judge Divane of influencing Suh's trial. (Petr's Ex. U, at 106-07, Ex. X, at 105-06.)

Judge Morrissey testified that he considers himself a casual acquaintance of William Divane, O'Dubaine's first cousin once removed (in other words, William Divane is the first cousin of O'Dubaine's mother). (Petr's Ex. W, at 26.) Morrissey and William Divane testified that they were classmates at Fenwick High School in Oak Park, Illinois. (Petr's Ex. V, at 74, Ex. W, at 67.) Both men admitted that they were acquainted in high school but denied being close friends. (Petr's Ex. V, at 74, Ex. W, at 9.) Morrissey testified that since graduation in 1960, he and William Divane have met occasionally at Fenwick High reunions and other alumni events including annual golf outings and a Christmas luncheon. (Petr's Ex. W, at 9, 82-84.) William Divane also testified to having seen Judge Morrissey at Fenwick reunions and charity functions. (Petr's Ex. V, at 76.) According to Judge Morrissey, the two men carried on casual conversation when they happened

7

to meet under these circumstances. (Petr's Ex. W, at 28.)

Judge Morrissey testified that he had most recently spoken with William Divane at a Fenwick golf event during the summer of 2007. (*Id.* at 14-15.) According to Judge Morrissey, Suh's investigation into his connection to O'Dubaine's family came up in passing during this latest conversation. Judge Morrissey recalled that William Divane dismissed the matter as "crazy" before the conversation turned to other subjects. (*Id.*) William Divane testified that he could not recall whether he had seen Judge Morrissey after 2002 and that they had never had any conversation about Suh's trial. (Petr's Ex. V, at 88, 99.)

Judge Morrissey himself testified to being acquainted with Judge John Divane, Robert O'Dubaine's uncle (the brother of O'Dubaine's mother). The two were both Cook County judges and though they sat in separate buildings, Judge Morrissey related in his deposition that he spoke with Judge Divane some five or ten times at annual judicial conferences between 1983 and 1988 and maybe at a dinner for judges. (Petr's Ex. W, at 103-09.) Although he testified that he never spoke to Judge Divane at any other time, Judge Morrissey recalled that Judge Divane had a "gregarious" personality. (*Id.* at 106, 109.) In his deposition testimony, Judge Divane said that he could not recall ever meeting or speaking to Judge Morrissey and that he would not recognize him if they did meet. (Petr's Ex. U, at 17.)

Even though he testified to passing acquaintances with John and William Divane, Judge Morrissey testified that he did not know at the time of the trial that either man was related to Robert O'Dubaine. (Petr's Ex. W, at 23). He also testified that he did not communicate with anyone from the Divane family or anyone acting on the family's behalf about the case before or during the trial. (*Id.* at 142.)

After taking these depositions with leave of the court, Suh filed an Amended Petition for Writ of Habeas Corpus. In it, he argues that he is entitled to a writ of habeas corpus because Judge Morrissey's connections to the family of the victim, Robert O'Dubaine, establish an impermissible

appearance of bias in violation of the constitutional right to due process of law. Alternatively, Suh contends that the writ should issue because in the investigation leading to his trial and conviction, his belongings were subject to unreasonable search and seizure, and because his incriminatory statements were improperly used against him in violation of his Fourth Amendment rights.

## ANALYSIS

### A. Standard of Review

Under AEDPA, this court will grant a writ of habeas corpus only when the state court decision in question was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); *Virsnieks v. Smith*, 521 F.3d 707, 713 (7th Cir. 2008). A state court decision implicates the "contrary to" clause if it reaches a conclusion "'opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Allen v. Buss*, 558 F.3d 657, 660-61 (7th Cir. 2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 413 (2000)) (alterations in original). The state court's judgment falls under the "unreasonable application" clause if its application of federal law to the facts of the case was objectively unreasonable, that is, "'well outside the boundaries of permissible differences of opinion.'" *Franklin v. Sims*, 538 F.3d 661, 664 (7th Cir. 2008) (quoting *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002)). Finally, the factual findings of the state court are presumed correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Virsnieks*, 521 F.3d at 713.

### B. Judicial Bias Claim

Suh challenges the reasonableness of the state court's factual findings on the relationship between the trial judge and the victim's family as well as the application, to these facts, of Federal law regarding the due process right to an impartial judge. "'A fair trial in a fair tribunal is a basic

9

requirement of due process,'" but the contours of the right cannot be defined with precision. *Harrison v. McBride*, 428 F.3d 652, 668 (7th Cir. 2005) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)). The assumption that judges are unbiased can be rebutted with evidence of actual or presumed bias. *Franklin v. McCaughtry*, 398 F.3d 955, 960 (7th Cir. 2005). Bias is presumed—and due process violated—"when a judge presides in a case that 'would offer a possible temptation to the average man . . . to forget the burden of proof required to convict the defendant' or would 'lead him not to hold the balance nice, clear, and true between the state and the accused.'" *Harrison*, 428 F.3d at 668 (quoting *Tumey v. Ohio*, 273 U.S. 510, 532 (1927)).

Courts have traditionally presumed bias when the judge has a "direct, personal, substantial, pecuniary interest" in the outcome of the trial. *Tumey*, 273 U.S. at 523. In a very recent case, the Supreme Court held that bias would be presumed on the part of a state supreme court justice in a case involving a company whose chairman and principal officer had made substantial contributions to the justice's election campaign. *Caperton v. A.T. Massey Coal Co., Inc.*, 129 S. Ct. 2252, 2263-64 (2009). Suh's allegation of bias does not involve a pecuniary interest, though. In *Tumey*, the Supreme Court explained that, because not all questions of judicial recusal are constitutional, "matters of kinship, personal bias, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." *Tumey*, 273 U.S. at 523; *see also United States v. Mansoori*, 304 F.3d 635, 667 (7th Cir. 2002) ("Conflicts arising from the judge's familial relationships normally do not mandate recusal under the due process clause."). Indeed, Suh cites no precedent holding that a judge may not preside over a case involving a close relative, let alone a case involving a close friend's close relative. *See Railey v. Webb,* 540 F.3d 393, 414 (6th Cir. 2008) (collecting cases and concluding that "no case has ever applied the possible-temptation test to find a sufficiently biasing interest resulting from mere kinship"). Nevertheless, the court assumes, without deciding, that a temptation to forget impartiality exists, and bias is presumed, where a judge presiding over a criminal case has a close relationship with a close relative of the victim of the

alleged crime. *Cf. Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J., concurring) (bias would be presumed where a juror was "a close relative of one of the participants in the trial or the criminal transaction"). Even with that generous assumption, Suh has not shown he is entitled to relief.

The court begins with the state court's factual findings about the relationship between Judge Morrissey and Robert O'Dubaine's family. Suh argues that the following three statements by the Illinois Appellate Court were unreasonable:

- "in this case, there is no nexus to be established through further discovery,"
- "there was no connection between the Divane and Morrissey families," and
- "Judge Morrissey had no relationship to the victim."

(Petr's Pet. at 21-23.) The first statement is no longer relevant—this court has allowed further discovery, so it has no cause to review the state court's refusal to do so. The second statement is only unreasonable when read out of context. Contrary to Suh's assertions, the state appellate court *did* acknowledge that Judge Morrissey was acquainted with Judge John Divane and William Divane, the victim's relatives. (Resp's Ex. AA, at 10, 13.) By "connection," the court meant a closer link than the one Suh's evidence supports, and the one that the court acknowledged existed. Finally, Suh's argument about the third statement goes nowhere. Judge Morrissey's passing acquaintance with O'Dubaine's uncle and cousin does not mean that Judge Morrissey had a "relationship" with O'Dubaine himself. Accordingly, the state court's factual findings were reasonable.

Next, the court considers whether the state court reasonably applied the law to the facts before it. The court ruled that Suh had not presented any compelling reason to disregard Judge Morrissey's assertion that he did not know that his Divane acquaintances were related to Robert O'Dubaine. (Resp's Ex. AA, at 10, 13.) Suh speculates that discrepancies among the recollections of Judge Morrissey and the Divanes about the extent of their minimal contact over the years indicate a cover-up. The state court was certainly not required to accept that speculation, let alone

11

required to assume there was in fact a relationship so close that Judge Morrissey necessarily would have known that O'Dubaine was related to either of the Divanes. The state court's ruling was, therefore, reasonable because Suh's evidence did not show that his case was one of the "rare instances" where the Constitution requires judicial recusal. *Capterton*, 129 S. Ct. at 2267.

Finally, the court considers whether the state court's ruling was reasonable in light of all the evidence that Suh has presented, both in the state court and before this court. Suh argues that the evidence contains so many inconsistencies that the only possible conclusion is that Judge Morrissey had an extremely close relationship with Divane family such that the appearance of bias was so great as to violate Suh's rights under the Due Process Clause. (Petr's Pet., at 30.) The court considers each purported inconsistency separately before considering the evidence as a whole.

i. **Patrick Lavery and Sister Barbara McCarry**

Suh's bias claim began with Patrick Lavery's allegation that Sister Barbara McCarry disclosed to him her knowledge of a relationship between Judge Morrissey and the Divanes in a manner that implied she suspected that the proceedings against Suh were unfair. (Petr's Ex. J.) Lavery's affidavit is disturbing, first, because it directly contradicts McCarry's more recent deposition testimony that she did not and could not have made any such accusation. (Petr's Ex. X, at 22-23.) McCarry's statements, recounted in Lavery's affidavit, are hearsay; they might be used, if at all, to impeach McCarry, but are not admissible for the truth of the accusations Lavery ascribes to her. In any event, second-hand, disputed information simply does not warrant a finding that there was a disqualifying relationship between Morrissey and the Divanes.

Moreover, even if the court were to rely on Lavery's affidavit as discrediting McCarry's testimony, there is no reason to reach the conclusion that Suh urges, that McCarry is part of a massive cover-up. Crediting Lavery's affidavit over McCarry's testimony *might* suggest that the other deponents in this case have repeatedly perjured themselves. On the other hand, even if

12

McCarry did tell Lavery that a prejudicial relationship existed, that does not make it so. If the court were willing to assume that Lavery is telling the truth and McCarry is not, the court would find it much more likely that McCarry was passing on an untrue piece of gossip or merely alluding to the weak and distant connections between Judge Morrissey and the family that have since come to light. In his affidavit, Lavery depicts McCarry as a would-be whistleblower in a diabolical cover-up orchestrated by "the family" and implies that McCarry subsequently refused to stand by her original statements because she was cowed into silence by the powerful Divanes. (Petr's Ex. J.) Suh submits that minor inconsistencies among the statements of the four deponents can only be explained as a cover-up, (Petr's Pet. at 30), but there is no evidence of such a scheme beyond Lavery's own word.

      **ii.**      **Judge Morrissey and William Divane**

Even when read in a light favorable to Suh, the depositions of Judge Morrissey and William Divane, the victim's first cousin once removed, suggesta much more distant and casual relationship than Suh alleges. After being acquaintances in high school, the two men have encountered each other over the years at various alumni functions and sometimes had brief, casual conversations. (Petr's Ex. V, at 76, Ex. W, at 9, 82-84.) William Divane apparently remembers somewhat less contact than Judge Morrissey remembers, and Suh identifies this as a suspicious inconsistency. The court finds nothing suspicious about two casual acquaintances who have brief interactions less than once a year disagreeing about the extent of those interactions. These men simply do not know each other very well.

Potentially more troubling is the inconsistency between William Divane's and Judge Morrissey's recollection of a conversation they had after Suh's investigation began. Judge Morrissey remembered talking to William Divane at a golf event in the summer of 2007 and mentioning the investigation in passing before the conversation turned to other subjects. (Petr's Ex. W., at 14-15.) William Divane testified that he could not recall seeing Judge Morrissey after

13

2002 and that they had never discussed Suh's trial. (Petr's Ex. V, at 88, 99.) It is perhaps strange that the two could not agree on an encounter less than two years before they were deposed that concerned a seemingly serious topic, but it is worth pointing out that William Divane's statement that he never discussed the *trial* with Judge Morrissey is not necessarily inconsistent with the two briefly discussing the post-trial *investigation*. In any event, there is no reason to conclude that William Divane and Judge Morrissey are lying to cover up a deeper relationship for which there is no direct evidence. It is much more likely that William Divane forgot the encounter or that Judge Morrissey was mistaken about it.

Suh also submits that Judge Morrissey revealed the truth about the depth of his relationship with William Divane when he related to Suh's counsel during an informal interview early in her investigation that he "used to pal around" with William Divane. (Petr's Pet. at 26; Petr.'s Ex. O, at 8.) In his deposition, however, Judge Morrissey explained that he meant only that he saw William Divane from time to time over the years and was friendly with him in these encounters. (Petr's Ex. W, at 67.) Perhaps this is not the most obvious interpretation of the phrase "pal around," but neither is it so far-fetched as to be unbelievable.

Finally, Suh refers to what he perceives as William Divane's retraction, through Walter Morrissey, of a statement that William Divane had been good friends with Judge Morrissey. (Petr's Pet. at 26.) Assuming that Suh is correct that William Divane's lawyer first said that William Divane and Judge Morrissey were good friends but then called back to say that they were not, the court does not see the significance of this sequence of events. Correcting a misstatement, especially one made through an intermediary, does not harm an individual's credibility. Suh thinks the events are "befuddling" because William Divane's lawyer denied that he was correcting a misstatement, (Petr's Ex. O, at 20), but whether he was in fact changing his story is disputed. The lawyer disputed it on the phone and in writing. (*Id.* at 20, 26.) The only evidence that William Divane's lawyer truly said one thing and then another are the notes taken by Suh's lawyers of the conversations. (*Id.* at

14

10, 13-14, 20-22.) Although the notes are supported by an affidavit of one of Suh's lawyers, (*id.* at 1), they remain hearsay. The court is not suggesting that these notes are untrue, but aside from being disputed, they are somewhat ambiguous. For example, the notes from the first conversation report that Williams Divane's lawyer "stated that he and William were great, long-time friends," but whether "he" refers to William Divane or the lawyer—another classmate from Fenwick—is unclear. (*Id.* at 10.) In sum, this ambiguous and disputed account by Suh's lawyers is not sufficient evidence to cast doubt on the deposition testimony of Judge Morrissey and William Divane that the two never had a very close relationship.

### iii. Judge Morrissey and Judge John Divane

Judge Morrissey's connection to Judge John Divane, the victim's uncle, is evidently even less substantial than his relationship with William Divane. Judge Morrissey recalled having met Judge Divane a handful of times at judicial functions, but denies any social contact outside that context. (Petr's Ex. W, at 103-04, 107.) Judge Divane could not recall having met Judge Morrissey and asserted that he would not be able to recognize him. (Petr's Ex. U, at 17.) Suh argues that the only explanation for this minor inconsistency is a nefarious cover-up, (Petr's Pet. at 28), but again, in the court's view the inconsistency is best explained by the passage of time acting on what was, to begin with, a very weak connection. It is not surprising that one of the men would not recall what was at most a handful of brief meetings spaced over many years. It is also not unusual, as Suh suggests, that Judge Morrissey could have observed or learned that John Divane had a "gregarious" personality without knowing him well. (Petr's Ex. W, at 106.) When Judge Morrissey and Judge Divane did cross paths, it was at social events where such a personality would have been on display even without the two having any meaningful interaction.

### iv. Judge John Divane's Meeting with McCarry

As further evidence of a cover-up, Suh points to Judge Divane's meeting with McCarry. (Petr's Pet. at 26-27.) Suh thinks it is "bizarre" that McCarry sought to discuss the matter with

15

Judge Divane in person and that Judge Divane agreed to the meeting. While not everyone in McCarry's situation would have made the same decision, her explanation, that she prefers face-to-face discussions, is by no means incredible. (Petr's Ex. X, at 100-01.) Moreover, contrary to Suh's contentions, McCarry and Judge Divane were not "strangers;" they knew each other because Divane's children had attended the elementary school where McCarry was principal. (Petr's Ex. U, at 53-56, Ex. X, at 31, 33.) McCarry testified that she believed Lavery was trying to discredit Judge Divane, and because of their relationship, McCarry wanted to warn Judge Divane. (Petr's Ex. X, at 97-98.) Finally, the court does not agree that Judge Divane acted suspiciously when he agreed to go out of his way to meet a woman he knew as the principal of his children's elementary school in order to hear information relevant to the case of his relative's murder. (Petr's Ex. U, at 104-05.) There simply is not sufficient evidence to suggest that this meeting was part of some nefarious plot. Even if McCarry and Judge Divane are hiding something, Suh fails to connect it to any bias on the part of Judge Morrissey.

  **v.**   **Judge Morrissey's Quote in The Chicago Daily Law Bulletin**

In an article about Suh's case published in The Chicago Daily Law Bulletin while Suh's last state appeal was pending, Judge Morrissey is quoted as saying "I had [no] and have no relationship with the family of the victim. I never knew them and I do not know them." (Petr's Ex. P) (alteration in original.) At the time the article was published, Judge Morrissey had been interviewed by Suh's lawyers, so he did know about the connection to O'Dubaine. Suh argues that, based on that connection, Judge Morrissey's statement in the Law Bulletin is untrue and further evidence of his bias. (Petr's Br. at 26.) Again, the court finds far less basis for suspicion. First, the court notes that the Law Bulletin statement is more hearsay evidence and that it was made to a reporter, not under oath; courts typically do not rely on newspaper articles to settle factual disputes. *E.g., Cofield v. Alabama Pub. Serv. Comm'n*, 936 F.2d 512, 517 (11th Cir.1991). In addition, as Respondent argues, Judge Morrissey's statements, as reported in the Law Bulletin, do not necessarily contradict

16

his deposition testimony. (Resp's Br. at 30-31.) It is easy to understand "family" as "immediate family," that is, not including uncles and cousins. Judge Morrissey was not asked about the newspaper article in his deposition, but in a different context he made just such a distinction when he referred to the O'Dubaine family as different from the Divane family. (Petr's Ex. W, at 23.)

### vi. Suh's Sentence

The last piece of evidence that Suh believes demonstrates Judge Morrissey's bias is the length of his sentence. After finding that Suh was eligible for the death penalty, Judge Morrissey sentenced him to 80 years for first-degree murder and 20 years for armed robbery, to be served consecutively. (Resp's Ex. F, at 23.) The appellate court affirmed Judge Morrissey's sentences but ruled that they should be served concurrently. (*Id.* at 46-52.) Suh points to statistics that he claims show that his sentence was much higher than the typical sentence imposed at the time for murder, both in Illinois and the United States as a whole. (Petr's Pet. at 8.) This evidence is simply not convincing. First, the state statistics include all first-degree murders, not just death-eligible ones, and the countrywide statistics are not even limited to first-degree murders. (Petr's Ex. G, Ex. H.) In addition, sentencing decisions are based on individual circumstances, *People v. Fern*, 189 Ill.2d 48, 55, 723 N.E.2d 207, 210 (1999), so there is nothing inherently unusual about a specific sentence being longer than average, especially where that sentence was affirmed on appeal, (Resp's Ex. F, at 46-50). Judge Morrissey's sentencing decision simply does not suggest bias.

### vii. The Evidence as a Whole

In sum, the inconsistencies and evidence that Suh highlights amount to very little. Suh's evidence simply does not require the court to conclude that some untoward relationship is being hidden. The evidence, considered as a whole, does not point to anything beyond the state court's original determination of the circumstances. Judge Morrissey is a casual acquaintance of William Divane. The two know each other but are not particularly close. Judge Morrissey is a more distant acquaintance of Judge Divane. They have almost surely met on a few occasions in professional

17

settings, but do not know each other well. These tangential relationships are nowhere near the close connection that would require recusal under the Due Process Clause. Moreover, no evidence suggests that Judge Morrissey even knew that either of his passing acquaintances were related to Robert O'Dubaine. The court will not presume that a judge's relationship created an unreasonably high temptation for bias when there is no evidence that the judge was even aware of the purported relationship. Accordingly, Suh's request for relief based on judicial bias is denied.

**C.      Fourth Amendment Claims**

Next, Suh argues that he is entitled to habeas relief because evidence used against him at trial was gathered in violation of the Fourth Amendment. Specifically, Suh argues that his confession should not have been admitted at trial because it was the fruit of unconstitutional arrests in Dallas and Chicago as well as an unconstitutional search in Chicago. (Petr's Pet., at 32.) As Suh acknowledges, Fourth Amendment claims are not normally cognizable in habeas review under *Stone v. Powell*, 428 U.S. 465 (1976), but Suh argues that *Stone* does not apply to his claims about his arrest and search in Chicago because he was not given a full and fair opportunity to litigate those claims in state court. *Miranda v. Leibach*, 394 F.3d 984, 997 (7th Cir. 2005). Suh does not argue, though, that he did not have a full and fair opportunity to litigate his claim about the interaction with the DEA agents in Dallas. Instead, Suh makes the curious argument that the claim is not barred by *Stone* because he is complaining about an arrest rather than a search. (Petr's Pet. at 41.) This is a non-starter; nothing in *Stone* or later cases suggests that the rule of *Stone* applies only to some claims that evidence should have been excluded under the Fourth Amendment. *E.g., Wallace v. Kato*, 549 U.S. 384, 395 n.5 (2007) (rule of *Stone* applies to "Fourth Amendment violations"); *United States v. Johnson*, 457 U.S. 537, 562 n.20 (1982) (rule applies to "Fourth Amendment challenges"); *Stone*, 428 U.S. at 481-82 (applying rule to "a Fourth Amendment claim").

A habeas petitioner had a full and fair opportunity to litigate a Fourth Amendment claim if "(1) he clearly apprised the state court of his Fourth Amendment claim along with the factual basis

18

for that claim, (2) the state court carefully and thoroughly analyzed the facts, and (3) the court applied the proper constitutional case law to those facts." *Miranda*, 394 F.3d at 997. Factual or legal errors are not sufficient; *Stone* "does not guarantee a correct outcome on a Fourth Amendment claim but rather an adequate opportunity to pursue the claim in the state court system." *Id.* at 998. Suh argues that he was deprived of that opportunity because the appellate court's "entire discussion of the events in Chicago is expressed in a single sentence." (Petr's Pet. at 33.) This is not entirely true—the facts section of the court's opinion discusses the Chicago encounter in sufficient detail. (Resp's Ex. F, at 7-8.) With respect to applying the law to those facts, though, it is true that after spending 15 pages discussing Suh's interaction with DEA agents in Dallas and after concluding that it was consensual, the court took only one sentence to conclude that Suh's interaction with the Chicago police began as a consensual encounter as well. (*Id.* at 27-42.) Suh should not have been surprised by the court's emphasis, though: his brief on appeal, like the court's opinion, was principally focused on events in Dallas rather than those in Chicago. In 20 pages of arguments under the Fourth Amendment, Suh devoted little more than one page to the conduct of the police in Chicago. (Resp's Ex. C, at 26-45.)

Once understood as a proportionate response to the briefing before it, the appellate court's discussion of Suh's claims was more than adequate. The court's failure to restate the law it had already discussed at length does not show that it failed to "apply applicable law." *Hampton v. Wyant*, 296 F.3d 560, 563-64 (7th Cir. 2002). On the contrary, the court's discussion of the law with respect to the Dallas encounter showed a comprehensive understanding of the proper constitutional case law. (Resp's Ex. F, at 27-42.) The court's discussion of the facts was also sufficient. (*Id.* at 7-8.) Because Suh was properly allowed to present his Fourth Amendment claims in the state court, he may not pursue those claims now under federal habeas review. His petition is denied as to the Fourth Amendment claims.

## CONCLUSION

For the foregoing reasons, Petitioner's Second Amended Petition for a Writ Habeas Corpus [43] is denied.

ENTER:

Dated: November 3, 2009

_____
REBECCA R. PALLMEYER
United States District Judge